385 So.2d 665 (1980)
Lawton S. MOCK, Gene R. Tyner, Raymond D. Dery and Benjamin Ellis, Appellants,
v.
STATE of Florida, Appellee.
Nos. 78-1021, 78-1035, 78-1036 and 79-297.
District Court of Appeal of Florida, Second District.
May 28, 1980.
Rehearing Denied July 11, 1980.
Stevan T. Northcutt and Rick B. Levinson of Levine, Freedman, Hirsch & Levinson, Tampa, for appellants Mock, Tyner and Ellis.
Lawrence L. Scott, Tampa, for appellant Dery.
Jim Smith, Atty. Gen., Tallahassee, and Michael A. Palecki and Michael J. Kotler, Asst. Attys. Gen., Tampa, for appellee.
HOBSON, Acting Chief Judge.
Appellants Lawton S. Mock, Gene R. Tyner, Benjamin Ellis and Raymond D. Dery appeal their convictions and sentences for possession of over 100 pounds of cannabis with intent to sell or deliver, in violation of Section 893.13(1)(a), Florida Statutes, and importation of a controlled substance, in violation of Section 893.13(1)(d), Florida Statutes. In particular, appellants seek review of the trial court's denial of their motions to suppress evidence seized pursuant to an allegedly illegal stop. After the motions to suppress were denied, appellants entered pleas of nolo contendere which they subsequently moved the court to withdraw. The court denied the motions to withdraw pleas and appellants appeal that order also. We affirm.
The facts are as follows:
Two confidential informants told Captain Dempsey of the Polk County Sheriff's Department that appellant Dery was in possession of a DC 3 airplane which he *666 planned to use to import marijuana from South America. Captain Dempsey observed the plane at the Lakeland airport and noted that it was in the process of being converted to a freight configuration. Later, Dempsey learned that the plane was scheduled to land at a secluded, private airstrip in the Green Swamp. He contacted U.S. Customs officials and arranged to fly over the landing strip with a customs agent. During the flight, an orange marker was observed on the landing strip. Several days later Dempsey advised customs agent Warr that he, Dempsey, had to leave the area and had turned the case over to Sergeant Thompson of the sheriff's department.
Subsequently, Sergeant Thompson was informed by a customs agent that the DC-3 airplane had left the Lakeland airport without filing a flight plan. The following evening, about 6:30 p.m., another confidential informant telephoned Sergeant Thompson with the information that two camper trucks were standing by at the Green Swamp airstrip. At about 9:30 p.m. the same evening, Thompson met with customs agents and deputies at the post office parking lot in Polk City to brief them on the case. While the officers were talking they heard a multi-engine aircraft pass overhead at a low altitude without lights, heading in the direction of the Green Swamp. Another phone call to the confidential informant at 10:15 p.m. revealed that the plane had landed at the Green Swamp airstrip some five or six miles distant. The deputies and customs agents headed for the airstrip to seal off the area and locate the aircraft. The airstrip is situated just south of Rockridge Road and north of Dean Still Road in northern Polk County. These two roads run parallel generally east and west. About a mile west of the airstrip, Rockridge Road turns southwest and Dean Still Road intersects with it. From that point, Rockridge Road runs southwest and intersects with Highway 98.
As the law enforcement officers neared the airstrip from Polk City, they decided to approach the strip from the northern entrance off Rockridge Road. They experienced some difficulty locating the entrance road in the dark and the officers then decided to use the southern entrance off Dean Still Road. During this delay, Deputy Seay was stationed in an unmarked car at the intersection of Rockridge and Dean Still Roads in order to watch the area. At about 11:00 p.m. Deputy Seay spotted two camper trucks proceeding slowly toward him on Dean Still Road from the direction of the airstrip. There was no other traffic on the highway. Seay radioed Sergeant Thompson who told him to follow the trucks. He followed the trucks southwest on Rockridge for approximately one-half to three-quarters of a mile until the trucks pulled into the parking lot of a closed convenience store at the intersection of Highway 98. The trucks circled around in the parking lot in a manner which allowed them to stop with their headlights directed back toward Deputy Seay, thus impairing his view. After thirty to forty-five seconds, the trucks pulled out of the parking lot and one headed north on Highway 98, while the other turned south. Both trucks carried out-of-state license tags. Deputy Seay radioed this information, followed the northbound truck, turned on his blue lights and stopped the truck. He and two other deputies in his unmarked car approached the stopped truck with guns in hand. Appellant Mock exited the truck and approached the deputy. Seay stated that he immediately detected a strong odor of marijuana coming from the truck. He patted Mock down and retrieved a screwdriver and pair of pliers from his back pocket. The other two officers held appellants Ellis and Dery at gunpoint on the passenger side of the truck.
Seay searched the cab of the truck and found briefcases and aerial maps. Inside one of the cases he discovered what appeared to be a small amount of marijuana and a pistol. Mock, Ellis and Dery were then taken to the rear of the truck where Deputy Seay forced open the rear door with a screwdriver. He observed a number of burlap bags and, after reading the three men their rights, formally arrested them.
While the preceding events were taking place, Deputy Ball received a radio message *667 to be on the lookout for a yellow camper truck with an out-of-state license tag, proceeding south on Highway 98. He spotted the truck and pulled it over. Appellant Tyner met Deputy Ball at the rear of the truck. Ball stated that he had originally noticed nothing unusual about the truck or the manner in which it was driven; however, after the stop he noticed the strong odor of marijuana coming from the truck. Ball looked in the camper window and saw several burlap bags. He located the keys in the cab of the truck and opened the rear door.
All of the arrests occurred before the remaining officers located the airstrip and the DC-3 airplane. Both Deputy Seay and Deputy Ball testified that the trucks were proceeding on the highway at a legal rate of speed and pulled over immediately when the blue lights on the patrol car were activated. Seay stated that he was not instructed to stop the truck but made the decision to do so on his own. Sergeant Thompson testified that the roads in the area were lightly traveled although there were several residences nearby.
The threshold inquiry in this case is whether or not Deputy Seay was justified in stopping the first camper truck.
In order to stop an automobile and to request identification from its occupants, it is not necessary for the police to have probable cause.... [I]t is required that the officer have a founded or reasonable suspicion which requires further investigation.
Lewis v. State, 337 So.2d 1031, 1032 (Fla.2d DCA 1976). Events occurring after the initial stop are not relevant to this question.
The record shows that Deputy Seay had the following information at the time he stopped the first vehicle:
1) An airplane, allegedly carrying contraband, had landed at approximately 10:15 p.m. at the nearby airstrip;
2) Two camper trucks had been reportedly standing by at the airstrip;
3) Deputy Seay was under instructions to be on the lookout for two camper trucks;
4) There was no other traffic on the highway; and
5) At 11:00 p.m. two camper trucks approached at a slow speed from the direction of the nearby airstrip.
We hold that the deputy's suspicion regarding the vehicles was well founded in view of the information available to him at the time of the initial stop.[1] Of course, the justification for stopping the first truck carries over to the second since Deputy Seay would have stopped them both had they not split up at the intersection. Nothing further was required from that moment until Deputy Ball pulled over the second truck. There is no question, on the instant facts, that once the vehicles were stopped the officers almost immediately had sufficient probable cause to conduct a search. Thus, the trial judge was correct in denying appellants' motions to suppress evidence. We hereby affirm the judgments and sentences rendered in this cause.
AFFIRMED.
OTT and RYDER, JJ., concur.
NOTES
[1] Appellants have directed our attention to the case of Oesterle v. State, 382 So.2d 1293 (Fla.2d DCA, No. 79-1878, filed April 18, 1980). In that case we held a similar stop illegal; however, the facts are distinguishable in one major respect. In Oesterle, the officers received word that an aircraft loaded with marijuana had landed in a pasture. The plane was visible to the officers from the highway where they were positioned on lookout. One and one-half hours later, the officers spotted a camper truck approaching from the opposite direction of the aircraft heading in the direction of the pasture entrance gate. The arresting officer stated on cross-examination that he stopped the truck from one-quarter to three-quarters of a mile past the entrance gate. The truck made no effort to turn in at the gate.

We find the facts in Oesterle distinguishable from those of the instant case and thus decline to apply the holding in that case to appellants' benefit. We do agree, however, that out-of-county license tags and covered camper windows do not, absent more, justify an investigatory stop.